UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

COLLEEN DONLIN,                    :
                                   :
          Plaintiff,               :CIVIL ACTION NO. 3:05-CV-0585
                                   :
          v.                       :
                                   :(JUDGE CONABOY)
PHILIPS ELECTRONICS NORTH          :
AMERICA CORPORATION d/b/a          :
PHILIPS LIGHTINGS COMPANY,         :
                                   :
          Defendant.               :

---

**MEMORANDUM**

Here we consider Defendant's Motion for Summary Judgment in which it seeks judgment in its favor on Plaintiff's claims of sex discrimination and retaliation.  (Doc. 36.)  Plaintiff filed this Title VII action on March 25, 2005, alleging that her employer, Philips Lighting Company, a division of Philips Electronics North America Corporation, discriminated against her on the basis of sex when it failed to hire her for a full-time position while she was a temporary worker at Philips' Mountaintop, Pennsylvania, plant, and that she was not hired for a full-time position and terminated from her warehouse associate position in retaliation for inquiring about full-time status.  (Doc. 1.)  The motion has been fully briefed and is ripe for disposition.  For the reasons that follow, we conclude that summary judgment is not proper on Plaintiff's sex discrimination claim and summary judgment is granted on Plaintiff's retaliation claim.

1

### I. Background

The following facts are derived primarily from Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment, (Doc. 43), unless otherwise noted.

Plaintiff Colleen Donlin ("Plaintiff") began working at Philips' ("Defendant") Mountaintop plant as a temporary worker on or about May 13, 2002, and continued to work at the plant until January 12, 2003, when her assignment was terminated.  Plaintiff was assigned to Philips through Adecco Employment Services ("Adecco") - her actual employer during the relevant time period. (Defendant's Brief in Support of its Motion for Summary Judgment, Doc. 40 at 4.)  Plaintiff was assigned to Defendant's facility as a warehouse associate, (*id.* at 6), based on her experience as a forklift operator.  She was trained on first shift but worked on third shift where she was the only female temp worker.  Her third shift supervisor was Duane Wright.  (Doc. 40 at 8.)  The plant manager at the time was Brian Glasgow.  (Doc. 47 at 6.)

At the time of the assignment, Plaintiff understood "that the length of any assignment provided by Adecco may be reduced without notice."  (Doc. 37 ¶ 13; *see also* Doc. 44 at 1.)  Adecco explained to Plaintiff that she was required to work the hours set by Defendant's schedule and that would include overtime and weekends. (Doc. 37 ¶¶ 6, 7; *see also* Doc. 44 at 1.)  Adecco also informed Plaintiff that any consideration for full-time employment would

2

likely not occur for at least ninety days.  At some time after the ninety days had passed Plaintiff and coworker Gerry Medash heard that some full-time hiring was anticipated and asked first-shift "floor leader," Dave Wysocki, about the possibility of being hired. (Doc. 37 App. C at 61-62.)  Plaintiff and Medash checked with Wysocki weekly concerning the hiring situation, and, at some point, Wysocki told them to "just hang in there," they would be the next two temps to be hired.  (*Id.* At 64.)

Some time around November 13, 2002, Medash told Plaintiff and Timothy McHenry, another temp, that he had been hired by Philips as a full-time employee.  Because they believed they were both better producers than Medash, Plaintiff and McHenry went to speak with Terrance Phelan, the supervisor they were informed had made the hiring decision, to inquire why they had not been hired.  Phelan responded that he had been told by management not to hire anyone with a preexisting injury – particularly Plaintiff and McHenry. At the time, Brian Glasgow was the plant manager.  The preexisting injury Phelan identified for Plaintiff was a reported foot injury, but he did not identify the person who made the report.  Phelan also told Plaintiff that she had asked for a couple of Saturdays off and that temps did not have this right.  (Doc. 37 App. C at 74.)  Plaintiff alleges that Phelan became angry during her conversation with him and, thereafter, her workload was increased.

On November 22, 2002, Phelan assumed the position of plant

manager.  (Doc. 40 at 8.)  About two weeks later, McHenry was hired into a full-time position.  In addition to Plaintiff, several male temps were not hired into full-time positions.  According to Plaintiff, some of them were told they were not hired because their productivity was not up to standards.  (Doc. 37 App. C at 87-88.)

On January 12, 2003, Phelan ordered Adecco to end the assignment of Plaintiff, Philip Vanek and Robert Hummel because of a decrease in volume and a corresponding decrease in the need for temporary workers.  (Doc. 37 ¶¶ 35, 53.)  Defendant avers that the decision as to which temporary employees to terminate was made by reviewing attendance and performance.  (*Id.* ¶ 36.)  Plaintiff maintains that Phelan made all the decisions and she is unaware of the basis used.  (Doc. 44 ¶ 36.)

From the time Plaintiff began work at Philips through November 14, 2002, nine male temps were hired as full-time employees but no females that Plaintiff is aware of.  (Doc. 44 ¶ 39.)  For the year 2002, twelve temporary workers were hired on full-time, one of whom was a female.  (Doc. 46 Ex. CD-3.)

The two male employees with whom Plaintiff had questioned when they might be hired full-time - Jerry Medash and Tim McHenry - both had better attendance records than Plaintiff.  Medash had a perfect attendance record when he was hired on November 18, 2002.  (Doc. 37 ¶ 43; Doc. 44 ¶ 43; Doc. 46 Ex. CD-1.)  McHenry had called off sick one day when he was hired on December 23, 2002, and worked all

4

Saturdays he was required to work.  (Doc. 37 ¶ 42; Doc. 44 ¶ 42, Doc. 46 Ex. CD-1.)  Up until November 18, 2002, (when Medash was hired) Plaintiff was absent one day, reportedly an approved absence when she was either sick or had to appear in court, (Doc. 44 ¶ 23; Doc. 47 at 9 (citing Doc. 37 Ex. 4 at #10))[1], she was two hours late another day due to a migraine headache, (*id.*), and on October 26, 2002, she requested three Saturdays off - the request for November 23, 2002, received supervisor approval.  (Doc. 37 Ex. 5.) Thereafter, Plaintiff had pneumonia from December 4th until December 15th.  (Doc. 37 ¶ 23; Doc. 44 ¶ 23.)

In addition to Plaintiff's absences, the record contains the following other incidents: 1) on June 19, 2002, Plaintiff dropped a wooden pallet onto her right foot, (Doc. 37 ¶ 26); 2) on January 10, 2003, Plaintiff cut her index finger while cutting bands from a pallet, (*id.* ¶ 27); 3) Plaintiff hit a building pole while driving a piece of equipment at the warehouse, (*id.* ¶ 28); 4) supervisor Duane Wright observed Plaintiff sitting on a pallet talking with another employee during working hours, (*id.* ¶ 29); and 5) Glasgow observed Plaintiff sitting on product during working hours, (*id.* ¶ 30).  Plaintiff agrees with the first three reported incidents, explaining that the pallet disintegrated in her hand because of defective wood, the finger incident occurred on the day she was terminated and no damage was done when she hit a pole with the

---

[1]  The reason for this absence is disputed.

5

forklift.  (Doc. 44 ¶¶ 26-28.)  As to the incident(s) reported by
Wright and Glasgow, Plaintiff adds that at the time she was picking
up lamps that had spilled from a pallet.  (Doc. 44 ¶¶ 29, 30.)

Other temporary employees were not hired by Philips.  (Doc. 37
¶ 44.)  According to Plaintiff, these workers either did not want
to be hired or did not have records as good as Plaintiff's.  (Doc.
44 ¶ 44.)

Production records are no longer available for temp workers,
(Doc. 37 App. A at 24; *id.* App. C at 7-30.)  The only  record of
production is Plaintiff's own calendar on which she kept track of
her individual production.  (Doc. 46 Ex. 6.)

With this factual background, Plaintiff believed she was
discriminated against based on sex and that she was also the victim
of retaliation.  She filed a two-count Complaint on March 23, 2005.
(Doc. 1.)  She charges Sex Discrimination in violation of 42 U.S.C.
§§ 2000e-2 et seq (Count I) identifying the discriminatory
practices which include: 1) hiring other temporary male workers
despite Plaintiff's record of being an excellent worker; 2) hiring
other temporary male workers because she allegedly had a
disability; 3) hiring other temporary males because she complained
about not being hired; 4) hiring other temporary male workers
because of retaliation; 5) hiring other temporary male workers
because they were preferred over females; and ordering Plaintiff
discharged on the basis of sex.  (Doc. 1 ¶ 17-18.)  Plaintiff also

6

charges retaliation (Count II), alleging that after male temporary
workers who were working with Plaintiff were hired to full-time
positions, Plaintiff questioned her superiors several times why she
was not hired by Defendant and was advised that she would be next
hired for a full-time position, but instead was terminated in
January 2003.  (Doc. 1 ¶¶ 25-32.)

Defendant filed its summary judgment motion on April 7, 2006,
(Doc. 36), and its supportive brief on April 20, 2006, (Doc. 40).
Plaintiff filed a brief in opposition on May 8, 2006, (Doc. 43),
and Defendant filed a reply brief on May 23, 2006, (Doc. 47).
Therefore, this matter is fully briefed and is ripe for
disposition.

## II. Discussion

### A. *Summary Judgment Standard*

Summary judgment is proper "if the pleadings, depositions,
answers to interrogatories, and admissions on file, together with
the affidavits, if any, show that there is no genuine issue as to
any material fact and that the moving party is entitled to judgment
as a matter of law." *See Knabe v. Boury*, 114 F.3d 407, 410 n.4 (3d
Cir. 1997)(*citing* Fed. R. Civ. P. 56(c).  "[T]his standard provides
that the mere existence of *some* alleged factual dispute between the
parties will not defeat an otherwise properly supported motion for
summary judgment; the requirement is that there be no *genuine* issue
of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

7

247-48 (1986).

A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under the law applicable to the case. *Id.* at 248; *Levendos v. Stern Entertainment Inc.*, 860 F.2d 1227, 1233 (3d Cir. 1988). An issue of material fact is "genuine" if the evidence is such that a reasonable jury might return a verdict for the non-moving party. *Anderson*, 477 U.S. at 257. In determining whether a genuine issue of fact exists, a court must resolve all factual doubts and draw all reasonable inferences in favor of the nonmoving party. *Conoshenti v. Public Serv. Elec. & Gas Co.*, 364 F.3d 135, 140 (3d Cir. 2004) (citation omitted).

The initial burden is on the moving party to show an absence of a genuine issue of material fact. The moving party may meet this burden by "pointing out to the district court [] that there is an absence of evidence to support the nonmoving party's case when the nonmoving party bears the ultimate burden of proof." *Celotex*, 477 U.S. at 325. The non-moving party may not rest on the bare allegations contained in his or her pleadings, but is required by Federal Rule of Civil Procedure 56(e) to go beyond the pleadings by way of affidavits, depositions, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). When Rule 56(e) shifts the burden of proof to the non-

8

moving party, that party must produce evidence to show the existence of every element essential to its case which it bears the burden of proving at trial. *Equimark Commercial Finance Co. v. C.I.T. Financial Services Corp.*, 812 F.2d 141, 144 (3d Cir. 1987).

"In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of evidence." *Anderson*, 477 U.S. at 255. Therefore, when evidentiary facts are in dispute, when the credibility of witnesses may be in issue, or when conflicting evidence must be weighed, a full trial is usually necessary.

**B.    *Discrimination Based on Gender***

As set out above, Plaintiff alleges that she was discriminated against on the basis of gender when Defendant did not hire her as a full-time worker at its Mountaintop, Pennsylvania, facility. Defendant argues that summary judgment is proper on this count because Plaintiff cannot establish a *prima facie* case of discrimination, Defendant had a legitimate nondiscriminatory reason for not hiring Plaintiff, and Plaintiff cannot show that the reason was pretextual.  (Doc. 40 at 13-18.)

The parties agree on the framework the Court is to use in analyzing Plaintiff's claim - the familiar *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), three step burden-shifting scheme. (Doc. 40 at 13; Doc. 43 at 7-8.)  Under this approach, the plaintiff has the burden of showing that 1) she is a member of a

protected class; 2) that she was qualified for the job; 3) that she was rejected for the job; and 4) "she was either not hired for a position or fired from it under circumstances that give rise to an inference of unlawful discrimination." *Pivirotto v. Innovative Systems*, 191 F.3d 344, 357 (3d Cir. 1999) (quoting *Waldron v. SL Indus., Inc.*, 56 F.3d 491, 494 (3d Cir. 1995)).

If the plaintiff succeeds, the defendant then has the burden of production to come forward with a legitimate non-discriminatory reason for the action taken. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981). "The employer satisfies its burden of production by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). At this stage, the employer need not prove that the reason given was the actual reason for its action. *Id.*

Once the employer has met this "relatively light burden," *id.*, the burden of production shifts back to the plaintiff to show by a preponderance of the evidence that the employer's explanation is pretextual. *Id.* At the summary judgment stage, this means "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a

motivating or determinative cause of the employer's action." *Id.* at 764.

Defendant first argues that Plaintiff cannot establish a *prima facie* case of discrimination because she cannot show that she was qualified for the position. (Doc. 40 at 15.)  Asserting that "she was frequently absent and demonstrated a lack of concern for safety," Defendant maintains that her record proved that she was unqualified for the position.  (*Id.*)  As further support, Defendant cites the following: the two males hired had superior qualifications to Plaintiff; other temporary employees, both male and female, were not hired; Plaintiff has no information regarding the productivity or performance of the male employees hired; when Defendant ended Plaintiff's assignment, it also ended the assignment of two temporary male employees; and, if Plaintiff experienced discrimination at Defendant's plant, according to Adecco policy she should have filed a complaint with Adecco and she did not do so.  (*Id.*)

Plaintiff responds that she was clearly qualified for the position as evidenced by the length of time she was employed, and she satisfied the requirements for the position when she was assigned as a temp.  (Doc. 43 at 11.)  As further support she cites the fact that the reason given for ending her assignment was "'a decrease in volume and a corresponding decrease in the need for temporary workers' – not because of attendance issues."  (*Id.*)

11

Plaintiff also asserts that Defendant's argument is not properly raised in conjunction with the *prima facie* case - while objective job qualifications are properly raised at the prima facie stage of the analysis, performance issues are subjective qualifications properly considered at the pretext stage. (Doc. 43 at 12-13 (citing *Weldon v. Kraft, Inc.*, 896 F.2d 793, 798-99 (3d Cir. 1990)).) Plaintiff posits that, because Defendant had no standard by which attendance and performance were judged, attendance and productivity in this case cannot be seen as objective criteria. (Doc. 43 at 13.) Plaintiff also asserts that because Defendant invoked the performance rationale "after the fact," it should be discussed at the pretext stage. (*Id.* at 13-14.)

Defendant distinguishes *Kraft* and the other cases upon which Plaintiff relies, *Goosby v. Johnson & Johnson Medical, Inc.*, 228 F.3d 313 (3rd Cir. 2000), and *Tumulo v. Triangle Pacific Corp.*, 36 F. Supp. 2d 410 (E.D. Pa. 1999), arguing that these cases looked at subjective criteria while the criteria used here are objective. (Doc. 47 at 3-4.) In its reply, Defendant focuses on the attendance issue and maintains that because Plaintiff did not comply with the attendance policy, she cannot be considered qualified for the position. (*Id.* at 4-5.)

Viewing the evidence in the light most favorable to Plaintiff as the nonmoving party and drawing all reasonable inferences in her favor, *Conoshenti*, 364 F.3d at 140, we conclude that Plaintiff has

presented sufficient evidence to meet her burden regarding the
*prima facie* case.  Defendant's argument regarding workplace safety
is more subjective than objective, particularly given that no
safety policy or enforcement data have been offered and, as will be
discussed *infra*, there is a genuine issue of material fact
regarding the safety-related incidents.  (*See supra* pp. 5-6.)
Defendant's attendance argument is a closer call, but we cannot say
Plaintiff was not qualified due to attendance at all times when
decisions to hire other temps were made.  (*See* Doc. 40 at 9.)  In
considering this issue, we keep in mind that Plaintiff was not
terminated because of attendance, and when Medash was hired her
attendance indicated only one missed day and another day where she
was two hours late due to a migraine headache (but assertedly
finished her entire workload within the shift, (Doc. 44 ¶ 23)),
(Doc. 40 at 9).  Also, from the time Plaintiff began work at
Philips through November 14, 2002, nine male temps were hired as
full-time employees, (Doc. 44 ¶ 39), and, while Defendant cites
Medash's and McHenry's attendance records, (Doc. 47 at 5), we have
no information on the attendance records of the others hired.
Thus, although Defendant argues that attendance is an objective
criteria which can be measured against similarly-situated
employees, evidence presented only as to Medash and McHenry,
without references to others hired or Plaintiff's record at the
time of the other hirings, is insufficient to support the

objectivity of the attendance standard.  On this basis, we conclude that Plaintiff has satisfied her burden of establishing a *prima facie* case at this stage of the proceedings.

**2.   Defendant's Reasons for the Adverse Action**

Defendant asserts that if Plaintiff is able to establish a *prima facie* case, her claims must fail because it has provided legitimate nondiscriminatory reasons for its actions and Plaintiff cannot show that they are pretextual.  (Doc. 40 at 16.)

Defendant cites Plaintiff's attendance, productivity and safety records as the reasons she was not hired.  (*See*, *e.g.*, Doc. 40 at 16-17.)  These proffered reasons satisfy Defendant's "relatively light burden" of production, *Fuentes*, 32 F.3d at 763, at this stage of the proceedings: if a factfinder believed the proffered reasons, they would provide nondiscriminatory reasons for Defendant's action.

**3.   Plaintiff's Burden of Showing Pretext**

Defendant having met its burden of production, the burden shifts back to Plaintiff to show by a preponderance of the evidence that the Defendant's explanation is pretextual.  *Fuentes*, 32 F.3d at 763.  At the summary judgment stage, this means "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or

14

determinative cause of the employer's action." *Id.* at 764.  The

Third Circuit Court of Appeals has also addressed the quantum of

evidence required for a plaintiff to defeat summary judgment.   In

*Fuentes*, the court rejected the two extreme positions: "that the

plaintiff can avoid summary judgment simply by arguing that the

factfinder need not believe the defendant's proffered legitimate

reasons on the one hand, or that the plaintiff must adduce evidence

directly contradicting the defendant's proffered explanations on

the other." *Id.* (citation omitted).  Rather, the court found that

the solution was somewhere in between: "to avoid summary judgment,

the plaintiff's evidence rebutting the employer's proffered

legitimate reasons must allow a factfinder reasonably to infer that

*each* of the employer's proffered non-discriminatory reasons was

either a *post hoc* fabrication or otherwise did not actually

motivate the employment action." *Id.* (citations omitted).  This

does not mean that "the plaintiff must cast doubt on each proffered

reason in a vacuum.  If the defendant offers a bagful of legitimate

reasons, and the plaintiff manages to cast substantial doubt on a

fair number of them, the plaintiff may not need to discredit the

remainder." *Fuentes*, 32 F.3d at 374 n.7.

   *Fuentes* further explained that the plaintiff cannot simply

show that the employer's decision was wrong or mistaken because the

issue is whether the employer had a discriminatory motive, not

whether the employer "is wise, shrewd, prudent, or competent." *Id.*

at 765.  Rather, the plaintiff must show "such weaknesses,
implausibilities, inconsistencies, incoherencies, or contradictions
in the employer's proffered legitimate reasons . . . that a
reasonable factfinder could rationally find them unworthy of
credence."  *Id.* (citations omitted).

Here Defendant maintains that Plaintiff was not hired because
her record was inferior in the areas of attendance, productivity
and safety to the two males to whom she compares herself: Tim
McHenry and Gerry Medash.  (Doc. 40 at 16.)  Defendant compares
Medash's perfect attendance and McHenry's single absence to
Plaintiff's twelve alleged absences, two instances where she either
arrived late or left early and her request for three Saturdays off.
(*Id.* at 16-17.)  Defendant also cites Plaintiff's "extreme
carelessness," (*id.*), providing as examples an instance where she
"dropped a wooden pallet on her right foot, cut her index finger
and ran into a building pole while driving a piece of equipment in
the . . . warehouse."  (Doc. 40 at 17.)  Finally, Defendant notes
that Plaintiff's "supervisors observed her on at least two
occasions sitting on a pallet engaged in conversation with another
employee during working hours, instead of working."  (*Id.*)

Defendant avers that gender played no role in its hiring
decisions: Plaintiff's "absences, carelessness and laziness while
on the job were of her own creation.  Philips simply compared the
records and made the best business decision for the company."

16

(*Id.*)  Defendant further explains that

> after the departure of Brian Glasgow as the
> plant manager on November 22, 2002, the
> Mountaintop facility received approval to
> hire two additional full-time warehouse
> associates.  After evaluating the records of
> the temporary workers, it offered full-time
> positions to Gerry Medash and Tim McHenry.
> It did not offer a full-time position to Ms.
> Donlin based upon her attendance and
> productivity.

(Doc. 47 at 6.)

Plaintiff responds that Defendant has not submitted any
evidence to show that the incidents now relied upon were considered
prior to her termination.  (Doc. 43 at 20.)  Rather, Plaintiff
asserts that because it was not until after she was terminated that
Defendant prepared a document showing a record of her absences, a
reasonable jury could conclude that Defendant was attempting a
justification for what had actually been discriminatory intent.
(*Id.* at 20-21.)

Plaintiff also argues that because Defendant's currently
articulated reasons differ from the reasons given earlier
(preexisting injury and work slowdown), she has shown the required
"inconsistencies, incoherencies, or contradictions from which
pretext may be inferred."  (*Id.* at 21.)  As evidence of pretext,
Plaintiff further cites Defendant's lack of documented
qualification standards for hiring of temps into full-time
positions and the questions of fact as to some of the incidents
which Defendant points to as evidence to support its decision.

17

(Doc. 43 at 22-24.)  In the latter category, Plaintiff asserts the following: 1) the pallet incident was not due to carelessness but to the fact that the pallet disintegrated and fell on her foot when a nail came out; 2) the October 1, 2002, absence was not a sick day but a day where she had to appear in court, an absence for which she obtained prior approval; 3) on the day Plaintiff came into work two hours late because of a migraine, she completed her entire work load during the remainder of her shift; 4) when she was observed sitting allegedly doing nothing she was actually picking up broken glass and the incidents were never mentioned to her; 5) regarding requesting some Saturdays off, she was told this was an acceptable request; 6) when she had pneumonia, she contacted the temp agency and Defendant and provided a doctor's note upon her return; 7) no damage resulted from the incident where she bumped the pole; and 8) when she cut her finger on January 10, 2003, the decision to terminate her assignment had already been made.  (Doc. 43 at 23-24.)  In summary, Plaintiff asserts that the incidents cited in reality show that she was a conscientious worker and "the very listing of so many trivial events, particularly, when Donlin was never reprimanded for any of them and neither Donlin nor the temp agency was ever even spoken to concerning them, indicates their pretextual nature."  (Doc. 43 at 25.)

Finally, Plaintiff maintains that, although to survive summary judgment she need only present evidence of pretext in combination

with her *prima facie* case, she has also presented additional evidence of gender discrimination. (Doc. 43 at 25-26.) For example, Plaintiff points to Defendant's former female employee's testimony that she left her employment because of Phelan's attitude toward women and that she felt she was excluded from the "all men's group" because she was a female. (*Id.* at 25.) Plaintiff also points to her submission of evidence that Defendant's treatment of her "was not unique, that she was treated differently than males and that statistics would support an inference of gender discrimination." (*Id.* at 26.) These statistics include the following: of approximately seventy-five employees at Defendant's Mountaintop facility during Plaintiff's employment, only four or five were female; during that period no female was hired; while eleven males were hired into full-time positions during all of 2002, only one female was hired. (*Id.* at 26 n.5 (citing Plaintiff's Affidavit, (Doc.45)).)

Defendant attempts to undermine Plaintiff's assertion that being given different reasons for not being hired can be construed as evidence of pretext: Defendant maintains that Phelan's statement that Plaintiff was not considered for a full-time position because of a pre-existing injury was Phelan's impression of Glasgow's rationale made at a time when Defendant's Mountaintop facility did not have authorization to hire any full-time warehouse associates. (Doc. 47 at 7-8.) Defendant concludes that because the decision of

19

whom to hire was made after Glasgow left the employment of
Defendant, the previous rationale given "is of no moment." (*Id.* at
8.)  Defendant also points to inaccuracies and contradictions in
Plaintiff's assertions including conflicting statements in her
affidavit regarding her attendance record including her absence on
October 1, 2002, and the notification procedure she employed when
she had pneumonia. (*Id.* at 10.)  Defendant does not refute the
statistical information in Plaintiff's affidavit cited above.

　　We conclude that although this case is a close call, Plaintiff
has submitted sufficient evidence to survive summary judgment.  We
disagree with Defendant that being given different reasons for not
being hired "is of no moment."  This is particularly so because the
scenario Defendant now portrays does not square with the record:
contrary to Defendant's assertion that Medash was hired after
Glasgow left Defendant, the record indicates that he was hired on
November 18, 2002, (Doc. 46 Ex. CD-1), and Glasgow left Defendant
(and his plant manager position) on November 22, 2002, (*see*, *e.g.*,
Doc. 47 at 6).  The actual chronology of record shows not only that
Medash was hired when Glasgow was plant manager, but that Defendant
has further created an inaccurate context in which the Plaintiff's
and McHenry's conversation with Phelan took place: Defendant's
statement that the Mountaintop facility had not received approval
to hire any full-time warehouse associates at the time of Plaintiff
and McHenry's conversation with Phelan is inaccurate because Medash

20

had just been hired; and, contrary to Defendant's assertion, Phelan's conversation with Plaintiff and McHenry was not purely hypothetical because Phelan's rationale was given in response to the question of why Medash had been hired when Plaintiff and McHenry talked to Phelan about why they were not hired in reaction to Medash being hired before them (believing they were better producers). (Doc. 37 App. C at 71-79; Doc. 46 Ex. 1 at 55.) Therefore, at the very least, Phelan's statement as to why Plaintiff was not hired deserves some consideration.

A further consideration concerning Phelan's statement is that Glasgow does not recall making the statement attributed to him and testified that it is not a statement he would make. (Doc. 37 App. B at 14-15.) He also testified that the hiring and firing of warehouse associates was up to the supervisors - a position Phelan held at the time. (*Id.* at 13-14.) Glasgow further stated that he never told the supervisors who not to hire, it was a decision he left entirely to them and had no part of. (*Id.* at 13.)

Whether Glasgow actually made the statement or Phelan falsely attributed it to him, a reasonable factfinder could possibly infer that Phelan made up the reason and attributed it to Glasgow or, if in fact Glasgow made it, it was a reason that fit Plaintiff and provided a reason not to hire her at time when she had a good attendance record (though not as good as Medash's according to the

21

record)[2] and a good performance record (better than Medash's according to Plaintiff's testimony)[3].

The review of the record on this issue shows genuine issues of material fact regarding the reason Plaintiff was originally given for not being hired and the circumstances surrounding it.  This is so even though Defendant states that it has never argued that a previous injury was a basis for its decision, (Doc. 47 at 7-8) - the important fact is that Plaintiff was given this reason.

While we agree with Defendant that the pre-exiting injury rationale is not gender related, it is a reason different from what is offered now and Defendant seems to go to great lengths to paint a scenario most favorable to its position but contradicted by the record.  Importantly, the law does not require that an employer's earlier rationale be related to a prohibited consideration.  *See*, *e.g.*, *Potence v. Hazleton Area School District*, 357 F.3d 366, 369, 371 (3d Cir. 2004); *Abramson v. William Patterson College of New Jersey*, 260 F.3d 265, 283-84 (3d Cir. 2001).  *Abramson* agreed that "the ever-changing nature of the proffered reasons can be considered as detracting from their legitimacy."  260 at 284.  The

---

[2]  Compare Doc. 37 Ex. 9 showing Medash had perfect attendance as of his November 18, 2002, hire date with Doc. 47 Ex. 10 showing that as of November 18, 2002, Plaintiff was absent on October 1, 2002, and came in late on October 29, 2002.

[3]  See Plaintiff's Deposition testimony regarding both her assessment and McHenry's of their productivity as superior to Medash's.  (Doc. 37 App. C at 75-79.)

court further explained: "if a plaintiff demonstrates that the
reasons given for her termination did not remain consistent . . .
this may be viewed as evidence tending to show pretext, though of
course it should be considered in light of the entire record." *Id.*
(citing *Fuentes*, 32 F.3d at 765.)

Viewed in the light most favorable to Plaintiff and considered
in light of the entire record, including the fact that Defendant
does not dispute that neither attendance nor performance were
mentioned when Plaintiff was told she was being terminated because
of a work slowdown, we conclude that a reasonable factfinder could
find inconsistency a basis for pretext.

Looking at the record as a whole, we note that rather than
comparing Plaintiff to all temporary workers hired during
Plaintiff's employment at the Mountaintop facility, Defendant
compares her to only two employees, Medash and McHenry.  Although
we are not certain why the comparators are limited, assuming an
adequate comparison of similarly-situated employees, Defendant
states that hiring is based on a review of attendance and
productivity records and the record of these two employees was
"markedly superior to that of Donlin." (Doc. 40 at 16.)  As a
comparison, Defendant adds that Medash had no absences, McHenry had
only one, and "their supervisors made no notations regarding work
issues." (*Id.*)  We have discussed attendance above, noting the
importance of considering the time frame of when a decision was

23

made.

Regarding the production aspects of Plaintiff's performance record, her supervisor, Duane Wright, testified that she was very ambitious at one time and then her production dropped off "after she had been there for a while," but he did not remember specifically when. (Doc. 37 App. E. at 26.) He further testified that he talked with her when her production dropped off and he would not normally make a note of it unless the problem continued. (*Id.*) If he had made a note, it would have been in the notebook turned over to counsel in this case. (*Id.* at 27.) Wright's notes of record regarding Plaintiff do not show any notation about decrease in production. (*See* Doc. 47 Ex. 10.) The notes record only attendance, mention of an observation of Plaintiff limping which she attributed to a sports injury, and her schedule when she returned to work after having pneumonia. (Doc. 47 Ex. 10.) Defendant has not retained any performance records from the relevant period. (Doc. 37 App. E at 21-24, 28-30.) Plaintiff's own record of her individual performance is the only written production record. (Doc. 46 Ex. 6.)

Based on this review of the production aspects of Plaintiff's performance record and Defendant's reliance on production as a basis for its employment decisions regarding Plaintiff, (*see*, *e.g.*, Doc. 37 App. A at 49-50), we conclude that production issues at relevant times present issues of credibility.

Turning now to the matter of supervisors' "notations regarding work issues," Defendant does not cite to, nor do we find, any such notations regarding Plaintiff in the record presented.  As discussed above, the only information regards attendance, the observation of Plaintiff limping and work schedule.  The deposition testimony of Plaintiff's supervisor Duane Wright refers to other notebook entries, (*see*, *e.g.*, Doc. 37 App. E at 45), but they are not in the record before us, (*see* Docs. 37, 46).  Moreover, the document to which Wright referred in his testimony was prepared to send to the human resources person after Plaintiff was terminated. (Doc. 37 App. E at 30-32.)  Because Medash and McHenry were not terminated, no similar document would have been prepared for them. Further, because Wright's notebook of record does not show entries relating to safety or productivity for any of the three employees discussed, Defendant's statement that "supervisors made no notations regarding work issues" as to Medash and McHenry cannot be seen to support that their record was "markedly superior" to Plaintiff's as to "work issues."[4]

Given the lack of comparative documentation except the limited attendance data provided, we must review the basis of Defendant's reference to Plaintiff's "carelessness and laziness while on the

---

[4]  Our conclusion should not be construed to indicate that an employer's report prepared after termination is improper – as discussed in *Fuentes*, documenting the reasons for adverse employment actions is a sensible business practice.  32 F.3d at 766.

job," (Doc. 40 at 7), as support for its hiring decision.  Three incidents give rise to the "carelessness" characterization: 1) on June 19, 2002, Plaintiff dropped a wooden pallet onto her right foot; 2) on January 10, 2003, Plaintiff cut her index finger while cutting bands from a pallet; and 3) Plaintiff hit a building pole while driving a piece of equipment.[5]  (Doc. 40 at 10.)

Plaintiff asserts that questions of fact arise as to these issues which she portrays as "a bagful of incidents." (Doc. 43 at 20, 23.)  Acknowledging that a wooden pallet fell on her foot, she denies that it was due to her carelessness: the cause was that the pallet disintegrated when a nail came out. (*Id.*)  Plaintiff asserts that the decision to terminate her had already been made when the finger cutting incident occurred. (*Id.* at 24.)  Finally, Plaintiff also acknowledges that she hit a pole but notes that her supervisor testified that no damage was done. (*Id.*)

Two incidents give rise to the "laziness" characterization of Plaintiff's job performance: 1) Wright observed Plaintiff sitting on a pallet talking to another employee during work hours; and 2) Glasgow observed Plaintiff "sitting on product" during work hours instead of working. (Doc. 40 at 10.)

Plaintiff denies sitting down and not working. (Doc. 43 at 10.)  She testified that she recalled an occasion when she was

---

[5]  Supervisor Wright sets the date of the pole incident as September 19, 2002. (Doc 37 App. E at 39.)

asked why she was sitting down and she responded that she was picking up broken glass.  (*See* Doc. 37 at 54.)  Wright testified that he thought he recorded this incident in a notebook, (Doc. 37 App. E at 45), but the current record does not reflect such an entry.  Plaintiff asserts that neither Wright nor Glasgow mentioned anything about these incidents to her at the time and there was no disciplinary action or reprimand.  (Doc. 43 at 24.)

Given the disputed circumstances of the above incidents and the fact that one of the cited careless incidents occurred after Defendant decided to hire other temporary workers (cut finger on January 10, 2003), a reasonable factfinder could find that Plaintiff has cast sufficient doubt on the "carelessness" rationale for its decision not to hire Plaintiff.  Similarly, we find the basis of Defendant's "laziness" characterization sufficiently suspect to allow a reasonable factfinder to find it pretextual.

We agree with Defendant that Plaintiff's affidavit is not completely consistent with earlier testimony, (Doc. 47 at 8-10), and we do not credit any contradictory evidence presented in the affidavit.  We also concur with Defendant that both Medash and McHenry had superior attendance records to Plaintiff's.  (*See* Doc. 47 at 7.)  But as discussed above, Plaintiff's attendance must be assessed chronologically, i.e., how her attendance record compared with that of the person hired *at the time of the hiring*, not when she was terminated.  Moreover, attendance must be assessed as just

27

one component of Defendant's proffered rationale which also included productivity and safety concerns - both of which are on much less solid footing than the attendance basis.

In deciding whether summary judgment is proper in this case, we are guided by the standard established in *Fuentes* and set out above for the quantum of evidence necessary to avoid summary judgment, including the situation where the employer offers a "bagful of reasons." 32 F.3d at 746 n.7.   Though a "bagful" is not defined, we conclude that attendance, production, laziness and carelessness (along with the injury and work slowdown previously offered) can be considered a "bagful of reasons."  Thus, this is a situation where Plaintiff may not need to discredit each one to survive summary judgment.  *Id.*  The *Fuentes* court reasoned that if the defendant offers a variety of reasons

> and the plaintiff manages to cast substantial
> doubt on a fair number of them, the plaintiff
> may not need to discredit the remainder.
> That is because the factfinder's rejection of
> some of the defendant's proffered reasons may
> impede the employer's credibility seriously
> enough so that a factfinder may rationally
> disbelieve the remaining proffered reasons,
> even if no evidence undermining those
> remaining rationales in particular is
> available.

*Id.; see also Abramson*, 260 F.3d at 284.  The *Fuentes* principles have been applied to require plaintiffs to present evidence contradicting core facts put forward by the employer.  *Kautz v. Met-Pro Corp.*, 412 F.3d 463, 467 (3d Cir. 2005).

Here we find that Plaintiff has done so.  Because of the weaknesses outlined above in the productivity and safety rationales and because Defendant has offered different reasons for not hiring Plaintiff at different times, we conclude that a reasonable factfinder may conclude that Defendant's credibility is undermined to a degree that casts doubt on Defendant's true motivation. Because evidentiary facts are in dispute and the credibility of witnesses may be at issue, summary judgment is not proper on Plaintiff's sex discrimination claim.

## C.   Retaliation

Plaintiff agrees with Defendant that she did not engage in statutorily protected conduct necessary to support a separate retaliation claim.  (Doc. 43 at 8 n.1.)  Therefore, summary judgment is granted for Defendant on Plaintiff's retaliation claim.

## III. Conclusion

For the reasons discussed above, summary judgment is denied as to Count I - Sex Discrimination and granted as to Count II - Retaliation.  An appropriate Order follows.


S/Richard P. Conaboy
RICHARD P. CONABOY
United States District Judge


DATED: _July 17, 2006

_____

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

COLLEEN DONLIN,                      :
                                     :
        Plaintiff,                   :CIVIL ACTION NO. 3:05-CV-0585
                                     :
        v.                           :
                                     :(JUDGE CONABOY)
PHILIPS ELECTRONICS NORTH            :
AMERICA CORPORATION d/b/a            :
PHILIPS LIGHTINGS COMPANY,           :
                                     :
        Defendant.                   :

---

## ORDER

AND NOW, THIS 17th DAY OF JULY 2007, FOR THE REASONS SET OUT
IN THE ACCOMPANYING MEMORANDUM, IT IS HEREBY ORDERED THAT:

1.   Defendant's Motion for Summary Judgment, (Doc. 36), is
     DENIED in part and GRANTED in part;

2.   The motion is DENIED as to Count I - Sex Discrimination;

3.   The motion is GRANTED as to Count II - Retaliation;

4.   The Clerk of Court is to mark the docket.



                         S/Richard P. Conaboy
                         RICHARD P. CONABOY
                         United States District Judge